JMH:GMR
F. #2023R00169

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN APPLE IPHONE IN EVIDENCE BAG NUMBER A6602269 WHICH IS IN LAW ENFORCEMENT CUSTODY AND CURRENTLY LOCATED WITHIN THE EASTERN DISTRICT OF NEW YORK . | APPLICATION FOR A SEARCH WARRANT FOR AN ELECTRONIC DEVICE<br><br>Case No. 23-MJ-210 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, MATTHEW RIZZO, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an Apple iPhone in evidence bag number A6602269—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI") and have been for over four years. I have been involved in the investigation of numerous cases involving drug trafficking, including cocaine investigations and drug trafficking through airports. I have also been involved in the execution of search warrants on electronic devices and the review of responsive electronic data,

the review of search warrant returns provided by electronic communication service providers, and other electronic stored evidence.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. The property to be searched is an Apple iPhone in evidence bag number A6602269, hereinafter the "Subject Device." The Device is currently in the custody of HSI and located within the Eastern District of New York.

5. The applied-for warrant would authorize the forensic examination of the Subject Device for the purpose of identifying electronically stored data particularly described in Attachment B.

6. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 952(a) and 960 (Importation of Controlled Substances) have been committed by JEVAUGHNY BANCY ("BANCY"). There is also probable cause to search the Subject Device described in Attachment A for evidence and instrumentalities of these crimes further described in Attachment B.

**PROBABLE CAUSE**

7. HSI is currently investigating the importation of cocaine into the United States by BANCY. On or about February 22, 2023, BANCY arrived at Terminal 4 at John F. Kennedy Airport ("JFK") in Queens, New York aboard Caribbean Airlines flight BW5 from Kingston, Jamaica. As described more fully below, BANCY was stopped and searched by United States Customs and Border Protection ("CBP") officers and found in possession of over two kilograms of cocaine. BANCY was arrested and charged in a federal complaint under docket number 23-MJ-171 (E.D.N.Y.).

8. Upon BANCY's arrival in the United States, he was approached by CBP officers who asked him where he was coming from and why he had traveled to the United States. BANCY responded that he was coming from Jamaica to visit his cousin for three weeks. BANCY also stated that all of the bags he had brought with him were his personnel belongings and that he had not been asked by anyone to carry or bring any baggage or items with him into the United States.

9. After speaking with BANCY, CBP officers searched BANCY's black rolling suitcase and observed three plastic bags labeled as curry powder. The suitcase also contained approximately five pairs of shoes, including a pair of Reebok sneakers, which all smelled like acetone, or nail polish remover. The defendant stated that he had owned the Reebok sneakers from one year. The CBP officers used an X-Ray machine to examine the five pairs of shoes and observed that the shoes did not appear to have normal soles. Further examination with a drug sniffing dog indicated the presence of narcotics near the shoes.

10. The CBP officers cut open one of the plastic bags labeled as curry powder and observed a smaller plastic bag inside which was filled with powder. The interior smaller plastic bag was field tested, and the results indicated the presence of cocaine.[1] The other plastic bags labeled as curry powder were opened and also found to contain smaller plastic bags. The following image depicts some of the plastic bags labeled as curry powder and the plastic bags found within:



---

[1] BANCY stated in substance to CBP officers that he had purchased the bags of curry powder in a grocery store.

11. Following the examination of the packages of curry powder, CBP officers opened the soles of the five pairs of shoes found within BANCY's suitcase. CBP officers observed a white substance contained in panels in the soles of the shoes. The white substance inside one of the panels was field tested and determined to be positive for cocaine. The following images depict the pairs of shoes and the panels found inside of them:





12. The smaller plastic bags found within the bags labeled as curry powder and the panels of a white substance found within the shoes have a combined weight of over two kilograms. Following this investigation by CBP officers, BANCY was placed under arrest.

13. CBP officers recovered the Subject Device from BANCY in connection with the search of his belongings and his arrest. The Device was transferred into HSI custody and placed into an evidence bag with number A6602269. The following images depict the Subject Device after its seizure:

 

14. Based upon my training and experience investigating narcotics importation and making narcotics related arrests, I know that individuals engaged in this conduct frequently use cell phones, such as the Subject Device, to facilitate these crimes. Individuals who engage in this conduct often use cell phones to contact suppliers of narcotics in the country where the narcotics originate and then use cell phones to contact co-conspirators and other points of contact inside the United States. Cell phones are used to coordinate the delivery of the narcotics to the final destination in the United States and are likely to contain messages and other content related to the movement and distribution of the narcotics. Just as non-criminals

frequently use cell phones to communicate with other individuals they work with and to document and store information about their day-to-day lives, criminals often use cell phones to communicate with co-conspirators, to store the names and contact information of conspirators and to store records that would be evidence of criminal conduct. Even communications that do not directly relate to criminal activity can be evidence of an individual's affiliation or involvement in such crimes, as such communications can demonstrate the existence and extent of relationships with other co-conspirators. Here, based on my training and experience, I believe that evidence of such communications will be found in the Subject Device. Cell phones also contain records of the location where the cellular phone has been carried or used. For example, various messaging applications and social media applications record metadata indicating where the device's user is located at various times.

15. I have worked on other investigations involving individuals who have transported cocaine and other narcotics into the United States by concealing them in luggage. Review of electronic devices belonging to those individuals revealed electronic communications with co-conspirators and other electronic data which was related to the importation of narcotics.

16. I further know that the owners of cellular phones equipped with digital cameras, such as the Subject Device, often use the device to take photographs of themselves and their associates. These photographs may depict the owner's face, clothing and shoes. Such photographs may serve as evidence further linking the Subject Device, or items depicted in the photograph, to their owner.

17. I know from my experience that smart phones, such as the Subject Device, are capable of running applications for travel companies and airlines. These applications are

likely to contain information about the user of the Subject Device's travel history and plans, including flight information, itineraries and methods of payment. I know that Caribbean Airlines, the company which operated the flight on which BANCY traveled from Jamaica to New York, offers such an application for use by its customers.

18. The Subject Device is currently in the lawful possession of HSI. It came into HSI's possession as described above. Therefore, while HSI might already have all necessary authority to examine the Subject Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Subject Device will comply with the Fourth Amendment and other applicable laws.

19. The Device is currently in storage within the Eastern District of New York. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Subject Device first came into the possession of HSI.

## TECHNICAL TERMS

20. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and

from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media.

9

      Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs

usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

11

21. Based on my training, experience and research, I know that the Subject Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

23. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Subject Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Subject Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

12

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

25. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not

involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

26. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

                                            Respectfully submitted,

                                            *Matthew C Rizzo*
                                            Matthew Rizzo
                                            Special Agent
                                            Homeland Security Investigations

Subscribed and sworn to before me *by telephone*
on arch 8, 2023:

__*Vera M. Scanlon*
HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

14

**ATTACHMENT A**

The property to be searched is an Apple iPhone in evidence bag number A6602269, hereinafter the "Subject Device." The Subject Device is currently in the custody of law enforcement and located within the Eastern District of New York. The images below depict the Subject Device:

 

This warrant authorizes the forensic examination of the Subject Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.	All records on the Device described in Attachment A that relate to violations of Title 21, United States Code, Sections 952(a) and 960 (Importation of Controlled Substances) have been committed by JEVAUGHNY BANCY ("BANCY") since February 1, 2023, including:

   a.	Information and records, including electronic messages, regarding the transportation of cocaine into the United States from abroad;

   b.	Information and records, including electronic messages, regarding the delivery and distribution of cocaine within the United States;

   c.	Information and records, including electronic messages, related to obtaining cocaine in Jamaica for importation into the United States;

   d.	Information and records related to the purchase of a ticket on Caribbean Airlines from Kingston, Jamaica to New York, including billing information;

   e.	Information and records related to BANCY's lodging upon arrival in the United States;

   f.	Information and records related to payment for cocaine upon delivery inside the United States;

   g.	Electronic messages, including emails and text messages, between BANCY and co-conspirators regarding the importation and distribution of cocaine;

h. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

i. Call logs and contact lists which contain contact information for individuals and co-conspirators with whom BANCY was in contact with regarding his travel to the United States, travel within the United States, and the importation and distribution of cocaine;

j. Information and records that constitute evidence indicating the Subject Device's user's state of mind, e.g., intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

k. Information and records related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

l. Information and records related to BANCY's schedule or travel from February 1, 2023 to the present, including travel within the United States and Jamaica;

m. Information and records related to the concealment of cocaine for importation into the United States, including concealment in packages of curry and inside of shoes;

n. Photographs and/or videos depicting BANCY;

2

o. Photographs, videos, and any images depicting the shoes in the image below:



p. Photographs, videos, and any images depicting the packages of curry powder in the below image:



    q.    Photographs, videos, and any images depicting narcotics, including cocaine;

    r.    All bank records, checks, credit card bills, account information, and other financial records; and

    s.    Information and records which assist in placing the above-described evidence in context.

2.    Evidence of user attribution showing who used or owned the Subject Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.